IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENWOOD DIVISION

| | |
|---|---|
| Michael Shealy, ) | |
| ) | Civil Action No. 8:10-574-JMC-KFM |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| Georgia-Pacific Wood Products, LLC, ) | |
| ) | |
| Defendant. ) | |
| ) | |

       This matter is before the court on the defendant's motion for summary judgment (doc. 29) and motion to strike (doc. 50). The plaintiff alleges he was terminated from employment by the defendant in violation of the Americans with Disabilities Act ("ADA") and the Age Discrimination in Employment Act ("ADEA").

       Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

       The defendant filed a motion for summary judgment on January 10, 2011. On January 12, 2011, the plaintiff filed his response in opposition. On February 28, 2011, the defendant filed a supplemental memorandum of law, and the plaintiff filed his response on March 11, 2011. The defendant filed a reply on March 21, 2011. Also on that date, the defendant filed a motion to strike requesting that the court strike portions of two exhibits attached to the plaintiff's opposition to the supplemental motion for summary judgment. The plaintiff filed his response in opposition to the motion to strike on April 4, 2011, and the defendant filed a reply on April 8, 2011.

**FACTS PRESENTED**

Defendant Georgia-Pacific Wood Products LLC ("Georgia-Pacific" or "the Company") has operated a complex in Prosperity, South Carolina, for 37 years. This complex contains both a Chip N Saw Mill ("the Mill") and a Plywood Plant (the "Plywood Plant"). The Mill and Plywood Plant each have their own manager and separate reporting structures within the Georgia-Pacific corporate structure. The Mill employs approximately 70 employees, while the Plywood Plant employs approximately 279 employees. The Mill produces, cuts, dries, and finishes random length lumber, lumber from yellow pine logs, and cores from the Plywood Plant (John Evans decl. ¶ 3).

The defendant employed the plaintiff at the Mill from 1973 to 1975 and then again from 1981 until his termination in 2009 (pl. dep. at 19, 24; Evans decl. ¶ 21). For the last several years before his termination, the plaintiff served as Maintenance Supervisor at the Mill (pl. dep. at 27). The plaintiff was, and understood himself to be, an employee at will of the defendant (*id.* at 56).

The defendant prohibits discrimination or harassment on the basis of "color, race, religion, gender, sexual orientation, national origin, ancestry, age, disability, pregnancy, veteran status or any other basis prohibited by applicable law" (*id.* at 58). The defendant requires all employees to adhere to its Code of Conduct. Employees receive a copy of the Code of Conduct and training regarding the Code of Conduct (*id.* at 50–51, ex. 4). The defendant provided the plaintiff with a copy of the Code of Conduct and training on the Code of Conduct during his employment (*id.* at 47–48, 50). The plaintiff testified that "it seem[ed] like [the training] lasted about ten or 20 minutes," and "we probably didn't go over it as much as we should have" (*id.* at 51). The plaintiff understood that as a supervisor his duties included enforcing the Code of Conduct and ensuring both he and his employees followed it (*id.* at 48).

The Code of Conduct contains the "MBM Guiding Principles" for all employees at Georgia-Pacific (*id.* at 50, ex. 4). As the plaintiff testified, "We were supposed to conduct all our business by these principles." One of the Guiding Principles is "respect." The plaintiff understood that as a Georgia-Pacific employee and supervisor, he was required to "treat others with dignity, respect, honesty and sensitivity; appreciate the value of diversity;[and] encourage and practice teamwork" (*id.* at 50–51).

The Code of Conduct also provides "Responsibilities" for all the defendant's employees and for "leaders" (*id.*, ex. 4). The plaintiff understood and agrees that as a supervisor he was to "lead by example and behave as a model for all employees" (*id.* at 53). Another section in the Code of Conduct is called "Asking Questions and Raising Concerns" (*id.*, ex. 4). This section sets forth a variety of ways that employees can ask questions or raise any concerns regarding their employment. They include: talking with an immediate supervisor, talking with a member of management, contacting local or corporate human resources, contacting the Compliance and Ethics Department, calling the Law Department, sending an email to the Ethics Department, or contacting the Guideline, either through a 1-800 number or a secure website (*id.*). The plaintiff knew that each of these reporting mechanisms was available during his employment with the defendant. However, he never complained regarding age or disability discrimination or anything else during his employment (*id.* at 55, 60).

The Code of Conduct also addresses "Corrective Action and Employee Discipline" (*id.*, ex. 4). As explained, "any employee who violates the law, the Code of Conduct, or other Company policies, procedures, standards, or work rules will be subject to appropriate disciplinary action, up to and including termination" (*id.*).

In the Code of Conduct's "Respect for Others" section, the Code provides that employees must "embrace our differences and use them to ensure that we can make our greatest contribution to the Company. GP appreciates the value of diversity. Treating other

3

employees with fairness, impartiality, awareness and sensitivity is always the right thing to do" (*id.*). The "Respect for Others" section also prohibits harassment in the workplace. The policy forbids all forms of discriminatory harassment, including but not limited to "visual displays, such as derogatory and or sexually-oriented posters, photography, pictures, pornographic displays, cartoons, drawings or gestures." The plaintiff understood this policy during his employment. The policy specifically explains that "the use of electronic media, including . . . email for such purposes will not be tolerated" (*id.* at 61-62, ex. 4). The plaintiff likewise understood this part of the policy during his employment (*id.*). Finally, the "Respect for Others" policy requires every employee "to follow our policy against unlawful discrimination and discriminatory harassment and to bring to the company's attention any action that does not comply with that policy or our commitment to equal opportunity. Supervisors and managers must be watchful for any signs that our policy is not being followed and must see that any possible violations are immediately referred for investigation, whether or not there has been a complaint" (*id.* at 63, ex. 4). The plaintiff understood this to be the expectation for supervisors while he was a supervisor at Georgia-Pacific (*id.* at 63). The plaintiff never made any report as a result of these expectations (*id.*).

The Code of Conduct sets forth a specific "Acceptable Electronic Usage" Policy (*id.*, ex. 4). The Electronic Usage Policy applies to Company email accounts (*id.* at 64). This policy lists inappropriate uses of electronic communication tools. Included in this list are the following "accessing, distributing, or storing materials that could be considered unethical, inappropriate, offensive, disrespectful or abusive to others" (*id.* at 64, ex. 4). The plaintiff admits he was aware of this policy and "probably understood it" while he was employed with the defendant. The plaintiff claims, however, that the defendant "never did really have a . . . good training on this." The plaintiff understood that the defendant had a right to look at the contents of his work email account (*id.* at 64-65).

4

The plaintiff's disability claims relate to two different medical conditions (*id.* 97–98). First, the plaintiff lost his left leg through amputation in 1983 while he was employed at the Mill (*id.* at 25). Second, the plaintiff was diagnosed with bladder cancer around the end of 2008 (*id.* at 86).

The plaintiff lost his leg in an accident that occurred on Mill property. The plaintiff had gone home for lunch on his motorcycle. On his way back into the Mill, he collided with a forklift (*id.* at 28). His leg was amputated in the accident (*id.*). When the plaintiff lost his leg in 1983, he was working in the maintenance department at the Mill (*id.* at 30). The plaintiff held various other positions in the Mill following his accident and was eventually promoted to Maintenance Supervisor (*id.* at 31). The plaintiff also received several awards from Georgia-Pacific after the loss of his leg (*id.* at 31–32). The plaintiff testified in his deposition that he never requested any accommodation or change in his work because of his leg amputation (*id.* at 96, 109).

The plaintiff was diagnosed with bladder cancer in late 2008 (*id.* at 86). In early January 2009, the plaintiff told John Evans, Mill Manager, about his diagnosis and that he would need treatments. Mr. Evans asked the plaintiff how long he would need to be out of work (*id.*). At that time, the plaintiff told him that he didn't know. He was just going to wait and see how the treatments affected him. The plaintiff chose only to be out partial days on the days he was actually receiving treatment (*id.* at 86-87). The plaintiff never requested any formal leave or completed any leave paperwork (*id.* at 91, 112). The plaintiff states that he "never requested any time off" as a result of his cancer (*id.* at 112). He also never made any other request regarding his cancer treatments (Evans decl. ¶ 19; pl. dep. at 91, 112). The plaintiff's half-day absences on the day of his treatment had no negative effect on Mill production (Evans decl. ¶ 19). No employees made any negative comments to the plaintiff about his need to be off for his treatments or acted like he couldn't do his job because of his cancer (pl. dep. at 91).

5

As described above, the defendant provides employees with a 1-800 number called the "Guideline". Employees may report incidents of what they perceive to be harassing or discriminatory behavior by calling the Guideline. When employees make a report to the Guideline, the defendant's Compliance and Ethics Department receives the report and then, depending on the type of complaint made, sends the complaint to either the EEO department, corporate human resources, or the human resources manager at the facility where the complaining employee works for investigation. On occasion, individuals from the EEO department, corporate human resources, and facility human resources may work together to investigate a complaint (Patrick Alexander decl. ¶¶ 8-9; Bridget Hawkins decl. ¶¶ 6).

On or about February 19, 2009, an employee made an anonymous complaint to the Guideline related to the Mill. Specifically the employee stated that he or she worked at the Mill and had observed Mill supervisor Carroll Wicker and another unnamed employee looking at pornographic pictures on the office computer. The employee further reported that this was not the first instance he or she had witnessed Mr. Wicker and another employee viewing pornographic material. The employee also reported that Mr. Wicker had pictures of naked women on his cell phone. As the complaint concerned inappropriate computer usage of a sexual nature, the EEO department received the complaint for investigation. The EEO department can access employee computer usage, including employee company email accounts, when a complaint is raised regarding inappropriate computer usage. The complaint was assigned to Bridget Hawkins, Manager, Affirmative Action and Compliance, in the EEO department (Alexander decl. ¶¶ 10-11; Hawkins decl. ¶¶ 7-8).

Nobody from the Mill participated in the investigation of the complaint (Evans decl. ¶ 6). Ms. Hawkins conducted an investigation of employees' computer usage and email accounts (Hawkins decl. ¶ 9; Alexander decl. ¶ 12). The first step Ms. Hawkins took in reviewing an employee's email and computer usage was to request access to the email

and an internet usage report through the Company's information technology department. (Hawkins dep. at 9-10). The second step was to review the emails and the internet report for conduct that was inappropriate relative to Company policies (*id.*). In determining which emails were inappropriate, Ms. Hawkins considered such factors as whether a racial slur was used and whether the email was pornographic or explicit (Hawkins dep. at 14-15). If she found inappropriate content, Ms. Hawkins' next step was to look at who the inappropriate emails were sent to or from and to determine if any of those persons were also employees of the defendant (*id.* at 9-10). If the sender or recipient of an inappropriate email was also one of the defendant's employees, Ms. Hawkins would then conduct the same three-step investigation with regard to that employee's computer usage and email accounts (*id.*).

Ms. Hawkins began by looking at the email account of the named employee, Carroll Wicker (Hawkins decl. ¶ 9; Alexander decl. ¶ 12; Hawkins dep. at 9). After finding that Mr. Wicker had both sent and received emails with what she considered to be content that violated the defendant's Code of Conduct, Ms. Hawkins looked at the email accounts of those employees who had sent and received inappropriate emails to and from Mr. Wicker (Hawkins decl. ¶ 9; Alexander decl. ¶ 12; Hawkins dep. at 9–11). Reviewing those employees' accounts led Ms. Hawkins to review even more employees' accounts for emails with content that violated the Code of Conduct (Hawkins decl. ¶ 9; Alexander decl. ¶ 12). Ms. Hawkins' investigation revealed that some employees had only received emails with inappropriate content, but had not sent any. Other employees had received and sent emails with content that was inappropriate based on innuendo or picture, but did not contain explicitly sexual content or racial slurs. Another category of employees had sent emails that contained explicit sexual content or racial slurs. Because Ms. Hawkins' investigation resulted in findings that several employees had violated the Code of Conduct at the Mill, she presented her findings to Patrick Alexander, Senior Human Resources Manager for the

Lumber Division, who was responsible for the Mill (Hawkins decl. ¶¶ 10-11; Alexander decl. ¶¶13-14).

Ms. Hawkins and Mr. Alexander made recommendations as to the appropriate discipline for each of the employees based on a number of factors: the number of inappropriate emails the employee had both sent and received; the content of the emails in question – whether it was inappropriate only because of innuendo or whether it contained explicitly sexually or racially derogatory material; whether the employee was a member of management; whether the employee had merely received the email or had sent the email to others; and, if the employee had sent the email to others, whether the employee had sent the email to other employees of the defendant or to friends or family outside the Company (Hawkins decl. ¶ 12; Alexander decl. ¶ 15; Hawkins dep. at 23). Mr. Alexander testified that the Company handled the investigation consistently for all employees whose email was searched (Patrick Alexander dep. at 19-20, 37-38). Individualized factors, such as an employee's medical history, age, seniority, and disciplinary history were not considered (*id.* at 19-20, 32-33, 37-38; Hawkins dep. at 44-45).

The recommended discipline for employees found to have violated the Code of Conduct varied from a verbal counseling to termination. Ms. Hawkins and Mr. Alexander recommended that three employees be terminated, eight employees receive a written warning, and one employee receive a verbal counseling (Hawkins decl. ¶ 13; Alexander decl. ¶ 16). The three employees whom Ms. Hawkins and Mr. Alexander recommended to be terminated had sent at least one explicitly sexually or racially derogatory email to other employees of the defendant. The three employees whose termination was recommended were Melissa Bickley, Joseph Bowers, and the plaintiff (Hawkins decl. ¶ 14; Alexander decl. ¶ 18). Ms. Bickley and Mr. Bowers were both 36 years of age at the time of their terminations (Alexander decl. ¶ 26).

The plaintiff's termination was recommended based primarily on two emails he had sent (Hawkins decl. ¶¶ 14–15; Alexander decl. ¶¶ 18–19). The plaintiff's work email account contained in the sent mail folder two emails with the subject line, "Air Force One," both sent on March 3, 2009 (Alexander decl. ¶ 19; Hawkins decl. ¶ 15; John Evans dep. at 28–29). The first email was sent at 10:24 a.m. to David E. Dowdy, the Operations Manager at the Mill. The second was sent at 11:04 a.m. to Melissa Bickley and Ernie Sease, both Mill employees. The content of the email is the same. The text reads, "This is funny, I don't care who you are…… LOOK AT THE TAIL SECTION (Check the tail number on Air Force 1)" (Alexander decl. ¶ 19; Hawkins decl. ¶ 15). Attached to both emails was a picture of Air Force One with the tail section reading, "N166ER" (pl. dep., ex. 5). Mr. Alexander and Ms. Hawkins interpreted this to mean "Nigger," in reference to the newly inaugurated President Obama (Alexander decl. ¶ 19; Hawkins decl. ¶ 15).

The plaintiff remembers seeing this email. He says that he does not remember forwarding it, but does not dispute that he did so. The plaintiff admits that this email clearly violates several provisions of the Code of Conduct (pl. dep. at 67-72). The investigation also revealed a number of emails the plaintiff had received that contained inappropriate sexual or racial innuendo. These emails were not as explicit as the "Air Force One" emails described above (pl. dep., ex. 6–8; Alexander decl. ¶ 20; Hawkins decl. ¶ 16). The plaintiff agrees that these emails also violated the Code of Conduct (pl. dep. at 75- 78).

Mr. Alexander presented the recommendations for discipline for those employees who had violated the Code of Conduct to Mill Manager John Evans on March 26, 2009 (Alexander decl. ¶ 17; Evans decl. ¶¶ 6, 8). Prior to Mr. Alexander presenting the recommendations, Steve Hendricks, Mr. Evan's direct supervisor, called Mr. Evans to inform him about the investigation and the recommendations (Evans decl. ¶¶ 6-7). He offered his support for Mr. Alexander's recommendations (*id.* ¶ 7). Mr. Hendricks' call was the first time Mr. Evans became aware of the email investigation (*id.* at ¶ 6). Mr. Evans reviewed the "Air

9

Force One" emails described above and accepted Mr. Alexander's recommendation to terminate the plaintiff (*id.* ¶¶ 12, 14). When Mr. Evans accepted this recommendation, he had no doubt that the plaintiff had sent the emails in question (*id.* ¶ 22; Evans dep. at 50). Mr. Evans also accepted Mr. Alexander's recommendations as to the appropriate discipline of the other employees, including the terminations of Ms. Bickley and Mr. Bowers (Evans decl. ¶ 17).

The plaintiff testified that it had "happened before" that an employee had been disciplined for using another employee's log-in information (pl. dep. at 69). He further testified that he had never known of anyone to use his computer to send email under his name (*id.* at 68).

Mr. Evans and Tommy Shields, the Mill Human Resources Manager at the time, told the plaintiff his employment was terminated on March 26, 2009. At that time, they showed the plaintiff the Air Force One emails. He did not dispute sending them (pl. dep. at 70; Evans decl. ¶ 21). The plaintiff has no idea who conducted the investigation into the emails, who made the decision to terminate his employment, or who may have recommended his termination (pl. dep. at 81-82). The plaintiff had never met Ms. Hawkins or Mr. Alexander (*id.* at 72–73; Alexander decl. ¶ 22). He has no reason to think they were aware of his age or any of his alleged disabilities (pl. dep. at 72-73, 91-92). Ms. Hawkins and Mr. Alexander testified that in fact they were not aware of the plaintiff's age or disabilities (Hawkins decl. ¶¶ 18-20; Alexander decl. ¶¶ 22-24; Hawkins dep. at 44).

Following the plaintiff's termination, his position of Maintenance Supervisor remained unfilled for over a year (Evans decl. ¶ 23). Other Mill employees assumed some of his duties (*id.*). In approximately May 2010, the Mill finally hired a replacement Maintenance Supervisor, J.B. Wicker (*id.*; pl. dep. at 167-68). The defendant's records show Mr. Wicker to be 51 years of age at his time of hire (Evans decl. ¶ 23).

***Motion to Strike***

In support of his opposition to the supplemental motion for summary judgment, the plaintiff submitted two pieces of evidence that are the subject of the defendant's motion to strike. Exhibit E is a spreadsheet apparently created by the plaintiff or his counsel showing terminations aggregated across both the Mill and the Plywood Plant (doc. 48-5). Exhibit G is a document showing graphs from Salary.com, purporting to depict the salaries of employees with the title "Maintenance Supervisors" in Prosperity, South Carolina in 2007 (doc. 48-7). This court has considered the parties' arguments on the matter and finds that, even if the evidence is considered by the court, the evidence fails to create any genuine issue of material fact, and the plaintiff's complaint fails as a matter of law as set forth below. Accordingly, should the district court adopt this court's recommendation, the motion to strike will be moot.

***Motion for Summary Judgment***

***Applicable Law and Analysis***

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds,* 490 U.S. 228 (1989). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248.

***ADA***

The plaintiff alleges in his amended complaint that the defendant retaliated against him for seeking reasonable accommodation under the ADA (amended comp. ¶¶10-13). To prove a claim for retaliation for seeking a reasonable accommodation, a plaintiff must first establish a *prima facie* case by showing that: 1) plaintiff engaged in protected activity by seeking a reasonable accommodation, 2) plaintiff suffered an adverse employment action, and 3) a causal connection exists between the protected activity and the adverse employment action. *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 706 (4th Cir. 2001). If the plaintiff can establish a *prima facie* case, then the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the termination. *Id.* If the employer does so, the plaintiff must demonstrate that the proffered reason is a pretext for retaliation. *Id.*

The plaintiff cannot make out a *prima facie* case of retaliation because he cannot show that he requested a reasonable accommodation. Importantly, the plaintiff does not even address his retaliation claim in his opposition to the motion for summary judgment. The plaintiff admitted in his deposition that he had never requested any accommodation with respect to his leg injury, and he could point to no accommodation he requested with respect to his bladder cancer (pl. dep. at 109 ("Q: [A]re you claiming that you asked [the defendant] to do something to make your job easier or to change your job based on your leg or your cancer that they refused to do? A: I never did ask them…")). The plaintiff did not even request leave or time off for his cancer treatments (*id.* at 112 ("Q: Was there ever any time off that you requested based on your cancer treatments that the company didn't give you? A: I never requested any time off.")). The plaintiff, as a supervisor, simply left early on the days he had treatment and was back at work the next day (*id.* at 87). No one said anything to the plaintiff about his leaving early (*Id.* at 91).

Second, the plaintiff can show no causal connection between his termination and any request for accommodation. The undisputed evidence shows that the individuals who investigated the plaintiff's email and recommended his termination had no knowledge of his disabilities or any request for accommodation (Hawkins decl. ¶¶ 18-20; Alexander decl. ¶¶ 22-24; Hawkins dep. at 44). Based upon the foregoing, the plaintiff's retaliation claim fails as a matter of law.

The plaintiff's claim of disability discrimination also fails. To prove a claim for discharge in violation of the ADA, a plaintiff must establish a *prima facie* case by showing: (1) he is within the ADA's protected class; (2) he was discharged; (3) at the time of his discharge, he was performing the job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. *Haulbrook*, 252 F.3d at 702. If a plaintiff can make out a *prima facie* case of discrimination, the burden then shifts to the employer to provide a

13

legitimate non-discriminatory reason for plaintiff's termination. If the employer does so, then the plaintiff must show that the non-discriminatory reason is pretext. *Marshall v. AT&T Mobility*, 2:10-cv-699-RMG, 2011 WL 2192812, at *1 (June 6, 2011) (slip copy).

Here, the plaintiff cannot show that his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination because of his disability. The plaintiff bases his disability claim on both his amputated left leg and his bladder cancer. The undisputed evidence shows that he was promoted, received multiple awards, and good performance reviews following his leg injury (pl. dep. at 31). In fact, the plaintiff continued to work for the defendant for more than 25 years after his leg injury. Further, the plaintiff's belief that the defendant must have just decided that he would be too expensive because of his injury and cancer (pl. dep. at 97) is also insufficient to establish a *prima facie* case as he presents no evidence in support of this belief. *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988) (Plaintiff's "own naked opinion" cannot establish a genuine issue of material fact). The plaintiff's arguments in support of his *prima facie* case are based on nothing more than speculation and are completely unsupported in the record:

> The management of Georgia Pacific *could* have easily considered [his disabilities] an inconvenience . . . as opposed to less qualified, less loyal, healthy employees. . . . The management . . . cannot reasonably foresee that Mr. Shealy was going to enter remission, and if the cancer had escalated instead of entering remission the amount of days and time off Mr. Shealy required *would* rise. The management *could* easily have seen this as a risk.

(Pl. resp. supp. m.s.j. at 14) (emphasis added). Based upon the foregoing, the plaintiff cannot establish a *prima facie* case of disability discrimination. *Jeffers v. Lafarge N.Am., Inc.*, 622 F. Supp. 2d 303 314 (D.S.C. 2008) (holding that a plaintiff "may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment").

14

Even if the plaintiff could establish a *prima facie* case of disability discrimination, he cannot show that the defendant's stated reason for firing him was pretext for discrimination. The plaintiff was terminated, along with two other individuals, all as part of an email investigation conducted by individuals completely unaware of the plaintiff's disability. Further, there is no evidence in the record that either of the other two employees who were terminated had any known disability. The undisputed evidence in this case shows other employees received the same Code of Conduct and training on the Code of Conduct as the plaintiff. *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649–50 (4th Cir. 2002) (affirming summary judgment for employer on discrimination claim where employee had no evidence that he was denied training other employees not in his protected class received). The undisputed evidence also shows the investigation that led to the plaintiff's termination was begun as a result of an anonymous complaint, was handled in the manner these investigations are typically handled, and that the investigative process was applied uniformly to all employees investigated. The same criteria were used for each individual with questionable emails to determine appropriate discipline, and that criteria led to the termination of three employees and the disciplining of eight other employees.

As argued by the defendant, the plaintiff's attempts to poke holes in the investigative process and call into question whether the defendant has proven that he actually sent the emails are misguided. The plaintiff questions the adequacy of the defendant's email investigation by pointing to the similarities between the emails in his sent folder and the emails sent by Ms. Bickley, who was also fired.[1] The plaintiff claims that the

---

[1] The plaintiff asks that the court take "judicial notice that during any Presidential election year, particularly in 2008, such political emails were commonplace and widely circulated. Although the email was racially offensive, it was no more offensive than others dealing with John McCain, George Bush or John Edwards" (pl. resp. supp. m.s.j. at 6 n. 3). The court cannot and will not take such "judicial notice." As argued by the defendant, the email in question is of absolutely no political value, and the question of whether or not the email is more or less offensive than emails not sent by the defendant's employees is irrelevant.

15

defendant "failed to consider the possibility that all emails came from the same or a different source and terminated Plaintiff without further substantiation of the authorship" (pl. resp. supp. m.s.j. at 7).  He claims that years earlier an employee had been disciplined for using another employee's log-in information (*id.*).  However, the plaintiff does not dispute sending the emails (pl. dep. at 70 ("I just don't remember sending it. . . . . [I]f it says I sent it, you know, that's the only thing I know.")).  He also testified that he has never known anyone to use his computer to send email under his name (*id.*).  Furthermore, the only question for the court is whether the defendant believed that he sent the emails, and the undisputed evidence shows that Mr. Evans, Ms. Hawkins, and Mr. Alexander all believed the plaintiff sent the emails.  Furthermore, the plaintiff's contention that in order to uniformly apply the Code of Conduct's electronic usage policy, the defendant would have to "routinely check the email of every single employee in the company" is absurd (pl. resp. supp. m.s.j. at 15).  The only evidence before the court is that the defendant implemented a thorough investigation and fair investigation.

The plaintiff also contends, "[The defendant] fired an employee who had an exemplary employment history and was more than qualified to do his job, while hiding behind the outcome of a selectively enforced company policy, that did not even affect the ability to perform on the job or the treatment of fellow employees" (pl. resp. supp. m.s.j. at 16).  However, the plaintiff even agrees that discipline was appropriate for his conduct (pl. dep. at 191 ("I don't believe it should have been overlooked.")).  The mere fact that the plaintiff disagrees with the level of discipline imposed or thinks it unfair in light of his record does not establish pretext. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) ("'[I]t is not [the court]'s province to decide whether the reason was wise, fair, or even correct, ultimately so long as it truly was the reason for the plaintiff's termination.'") (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir.1998)).

16

Based upon the foregoing, the plaintiff's claim for discriminatory discharge in violation of the ADA fails as a matter of law.

*ADEA*

In order to make out a *prima facie* case of disparate treatment under the ADEA, a plaintiff must show: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) at the time of the adverse employment action, he was performing his job at the level that met the employer's legitimate expectations; and (4) he was discharged under circumstances that raise a reasonable inference of unlawful discrimination. *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311-13 (1996). If the plaintiff establishes a *prima facie* case of discrimination, then the burden shifts to the employer to show a legitimate, nondiscriminatory reason for its actions. *Id.* at 311. The burden then shifts back to the plaintiff to establish that the employer's articulated legitimate, nondiscriminatory reason was a pretext to mask unlawful discrimination. *Id.*

The plaintiff's claim fails because he can point to no facts that give rise to an inference of discrimination. For an age claim, an inference of unlawful discrimination may be raised when evidence is presented demonstrating that a plaintiff was treated differently than similarly situated employees. *Saunders v. Stone*, 758 F. Supp. 1143, 1147 (E.D. Va. 1991). The undisputed evidence shows that no employee who sent emails with explicitly racial content was not terminated (Hawkins decl. ¶ 23; Alexander decl. ¶ 29).

The plaintiff claims that he meets this third prong because he had a higher salary than would a new employee hired into his position (pl. resp. supp. m.s.j. at 8). He bases this claim on the Salary.com listing from his personnel file from 2007 that is the subject of the motion to strike (pl. resp. supp. m.s.j., ex. G). As argued by the defendant, even if this evidence is accepted and true, all that it establishes is that the plaintiff had a high salary. The plaintiff has presented absolutely *no* evidence supporting his contention that he was fired because of his salary. Again, his opinion is insufficient to defeat summary

judgment. Furthermore, the undisputed evidence shows that as a result of the investigation, two employees under 40 were also terminated, while other employees over 40 were merely disciplined (Hawkins decl. ¶¶ 14, 21; Alexander decl. ¶¶ 18, 26–27). Also, the undisputed evidence shows that the plaintiff was replaced by someone over 50 years of age (Evans decl. ¶ 23), which belies an inference of age discrimination.

The plaintiff argues as follows in opposition to the motion for summary judgment:

> [O]ver the past several years, GP's Prosperity Operations Facility has been observed to undertake an alarming number of terminations involving long-term, tenured employees, including but not limited to its Regional Manager, Mill Plant Manager, Mill Operations Manager, Mill Maintenance Supervisor, Plywood Plant Maintenance Supervisor, Plywood Plant Purchasing Manager, Plywood Plant Quality Control Manager, Mill Human Resources Manager, and Mill Financial Accountant. (Dowdy Dep. p. 12). Furthermore, the intent of GP appears to target higher paid employees (Dowdy Dep. p. 12). Since January 1, 2008, Georgia-Pacific's Prosperity Operations Facility has terminated fifty two (52) employees, twenty seven (27) of which were over the age of forty. (Spreadsheet). This list does not include employees such as Mr. Dowdy, who was laid off under suspicious circumstances rather than directly terminated. (Dowdy Dep. p. 15).

(Pl. resp. supp. m.s.j. at 2-3).

In support of his claim, the plaintiff cites the spreadsheet that is the subject of the motion to strike (*see id.*, ex. E). As the plaintiff acknowledges, the spreadsheet aggregates employees terminated from the entire Operations Facility (*id.* at 3), which includes both the Mill where the plaintiff worked as well as the Plywood Plant. The undisputed testimony is that the Mill and Plywood Plant each have their own Manager and separate reporting structures within the defendant's corporate structure (Evans decl. ¶ 3). It is also undisputed that the decision maker for terminations of employment at the Mill is different than for terminations at the Plywood Plant (*id.* ¶ 5; Patrick Alexander decl. ¶¶ 5-6). Accordingly, it is of no relevance to the plaintiff's age discrimination claim how many

employees in his protected class were terminated at both the Mill where the plaintiff worked and the Plywood Plant, especially considering that the Mill accounts for only about twenty percent of the facilities' combined employees (*see* Evans decl. ¶ 3 (explaining the Mill employs approximately 70 employees, while the Plywood Plant employs approximately 279 employees)). Based upon the foregoing, the spreadsheet is irrelevant and fails to raise an issue of material fact.

The plaintiff also cites deposition testimony of David Dowdy taken in another case, *Wicker v. Georgia-Pacific Wood Products LLC*, C.A. No. 8:10-1356-JMC-KFM. In that deposition testimony, Mr. Dowdy speculates that salary could have played a role in some termination decisions; however, he made clear in his testimony that he had no personal knowledge of the company's intentions (pl. resp. supp. m.s.j., ex. B, Dowdy dep. at 12 ("I don't know that, I don't know that it was something that was really discussed. You know GP's, GP's - pretty strict policies, pretty narrow guidelines as far as what's discussed, what's able to be discussed . . . I don't ever remember sitting down and saying–and being part of a conversation where somebody said, this, this guy's at the end of his career, we need to get rid of him."). Further, Mr. Dowdy's speculation that his salary could have been a factor in his own termination is inadmissible. The plaintiff also cites Mr. Dowdy's deposition for the proposition that Mr. Dowdy was "laid off under suspicious circumstances" (pl. resp. supp. m.s.j. at 3). However, as pointed out by the defendant, the cited testimony does not remotely support this statement; it does not even mention the circumstances surrounding Mr. Dowdy's departure from Georgia-Pacific (*see* Dowdy dep. at 12, 15). Based upon the foregoing, this evidence is insufficient to create a genuine issue of material fact as to the plaintiff's termination.

The plaintiff alleges in his opposition to the motion for summary judgment that the defendant had a policy of "eliminating employees with the highest salary and medical

19

costs" that had a "disparate impact on older and physically challenged workers" (pl. resp. supp. m.s.j. at 9).  As argued by the defendant, however, even if the plaintiff had properly pled a disparate impact claim, his evidence does not support it.  The plaintiff must identify a facially neutral employment practice that is challenged and then show statistical evidence sufficient to show that the practice caused an adverse impact on individuals because of their membership in a protected group. *Watson v. Forth Worth Bank & Trust*, 487 U.S. 977, 994 (1988).  The plaintiff's evidence of a number of older workers' terminations by various decision makers at the defendant's different facilities is insufficient as a matter of law to show an adverse impact. *See Mallory v. Booth Refrigeration Supply Co.*, 882 F.2d 908, 912 (4th Cir. 1989).

Based upon the foregoing, the plaintiff's claims under the ADEA fail as a matter of law.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, the defendant's motion for summary judgment (doc. 29) should be granted.  Should the district court adopt this court's recommendation, the defendant's motion to strike (doc. 50) will be rendered moot.

s/ Kevin F. McDonald
United States Magistrate Judge

July 18, 2011
Greenville, South Carolina